WISE, Presiding Judge.
The appellant, Jimmy Lamar Killings-worth, Jr., was convicted of capital murder for the killing of Steven C. Spears, Jr. (“Steven”), and one count of second-degree assault for the assault of Monica Spears (“Monica”), a violation of § 13A-6-21(a)(2), Ala.Code 1975. The murder was made capital because he committed it through the use of a deadly weapon while the victim was in a vehicle, a violation of § 13A-5^40(a)(17), Ala.Code 1975; because he committed it through the use of a deadly weapon fired from a vehicle, a violation of § 13A-5-40(a)(18), Ala.Code 1975; and because he committed it during the course of a first-degree robbery or an attempt thereof, a violation of § 13A-5-40(a)(2), Ala.Code 1975. By a vote of 7-5, the jury recommended that Killingsworth be sentenced to imprisonment for life without the possibility of parole. The trial court overrode the jury’s recommendation and sentenced him to death. It also sentenced him to serve ten years in prison on the *726 assault conviction. Killingsworth filed a motion for a new trial, which the trial court summarily denied. This appeal followed.
Because this is a case in which the death penalty has been imposed, we have reviewed it for plain error. See Rule 45A, Ala. R.App. P. Although the lack of an objection at trial will not bar our review of an issue in a case involving the death penalty, it will weigh against any claim of prejudice the appellant may raise. See Ex parte Kennedy, 472 So.2d 1106 (Ala.1985). Rule 45A, Ala. R.App. P., provides:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review ... whenever such error has or probably has adversely affected the substantial right of the appellant.”
“[This] plain-error exception to the contemporaneous-objection rule is to be ‘used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.’ ” United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 n. 14 (1982)).
Monica testified that she was married to Steven; that they attended their nephew’s birthday party on the evening of December 10, 2004, and started driving home shortly after 11:00 p.m.; and that they stopped to get a drink and then continued toward their home. She also testified that, while they were on Highway 139 at approximately 11:30 p.m., a vehicle drove up behind them quickly; that Steven slowed down several times, and the vehicle eventually started to pass them; and that, as the vehicle got beside their vehicle, she “heard a boom or some kind of shot or something,” and their vehicle came to a stop. (R. 568.) She further testified that that she noticed that the vehicle’s window had been shattered and that Steven had his head down; that she tried to talk to Steven, but he did not respond; and that she checked Steven and realized he had been shot, was bleeding, and did not have a pulse.
Monica testified that she telephoned 911 and then flagged down a red sport utility vehicle. After the vehicle stopped, she approached the passenger side, saw three males in the vehicle, told them her husband had been shot, and asked them to help her. She testified that she could see the driver, who she identified as Killings-worth; the passenger, who was later identified as Troy Edward Connell; and a third person, who was later identified as Mark Jones, in the back seat.
Monica testified that she got back into her side of her vehicle and tried to telephone 911 again. She also testified that Killingsworth approached Steven, that the passenger followed her, and the third person did not get out of the other vehicle. Monica testified that she saw blood dripping, that she looked up and saw that Connell was hitting her in the face with a chain, and that she stepped out of her vehicle and tried to fight back. She then looked at Killingsworth and Steven and saw Killingsworth pull Steven partially out onto the ground and take his wallet. Kill-ingsworth and Connell got back into their vehicle and drove away, and she telephoned her father for help.
Brown Bolding, Monica’s father, testified that Monica telephoned him at about 11:30 p.m. on December 10, 2004, and asked him to come and help her. He went to the scene and discovered that Steven was dead. He also saw Monica, whose head and chest were covered with blood.
Darrell Upton, a paramedic, responded to the scene and examined Steven’s body. *727 Based on his observations, he testified that he concluded that Steven was dead and that the wound to his neck was consistent with a gunshot wound. The coroner arrived later and pronounced Steven dead.
Justin Killingsworth, Killingsworth’s cousin, testified that Killingsworth came to his residence at approximately 4:00 a.m. on December 11, 2004, and looked scared. He also testified that Killingsworth telephoned Connell and that Connell picked him up about twenty minutes later in a red Tahoe sport utility vehicle. Justin testified that Killingsworth told him that they had been on Highway 139, that it looked like someone had been killed, that law enforcement officers had started chasing them, and that he got out of the vehicle and came to Justin’s house.
Justin testified that, a few days, later, Killingsworth’s father got some family members together and told them that Kill-ingsworth had been one of the people who was involved in the shooting. When his grandmother asked what he had done, Killingsworth said that they
“were messed up and drinking whiskey and that Troy said he wanted to kill somebody. And [he] thought he was just playing. And they went to pass this vehicle, and Troy shot in the vehicle. He said the vehicle kept getting slower and slower and went off the side of the road. And they turned back around, and Troy got out, opened the door, and the guy fell out of the vehicle. And then he, the woman was hollering, and Troy started beating her with the chain. And [he] started panicking and honking the horn and left. Troy got back in the vehicle, and then they left.”
(R. 669.) Justin also testified that, afterward, Killingsworth told him that Connell had gotten into the vehicle and opened the door and that Steven had fallen out. Finally, he testified that he told law enforcement officers about what Killingsworth had said.
Brad Abbott, a coach at Jemison High School, testified that, on December 10, 2004, he and Coach Brent Hubbard were driving home from Birmingham in Hubbard’s truck. Around 10:00 p.m. or 10:30 p.m., while they were near Highway 139, a red sport utility vehicle pulled behind them at a high rate of speed and flashed its lights, as if trying to get them to pull over. They pulled into a church parking lot, and the other vehicle pulled in at an angle toward the driver’s side door. Abbott identified Killingsworth as the driver of the red vehicle. He testified that the passenger said he thought they were someone else and kept talking to them, as if attempting to keep them there, when they started to drive away. Finally, he testified that they drove away toward Highway 139 and that the vehicle followed them, but they eventually lost sight of it.
Dr. Art Shores testified that he performed an autopsy on Steven’s body. Based on his examination, he testified that Steven bled to death from a gunshot wound to his neck.
Jimmy Lamar Killingsworth, Sr., Kill-ingsworth’s father, testified that, about one week before Christmas 2004, he talked to Killingsworth, and Killingsworth admitted that he had been involved in the killing of Steven. He also testified that Killings-worth stated that he had been in a vehicle with Connell and Mark Jones, that he was driving the vehicle when Steven was shot, that they turned around and went back to the vehicle, that Connell got out and beat a lady with a chain, and that he got the wallet from the driver.
Jimmy testified that he saw Killings-worth, Connell, and Jones at Connell’s grandmother’s house between 9:00 p.m. and 10:00 p.m. on December 10, 2004. *728 They were in Connell’s sport utility vehicle, and Killingsworth was driving, Connell was in the passenger seat, and Jones was in the back seat. He testified that Kill-ingsworth had been drinking, but did not appear to be intoxicated.
Investigator Jody Wade of the Bibb County Sheriffs Department testified that, on December 21, 2004, officers located Connell’s red Tahoe sport utility vehicle at Professional Paint and Body in Montevallo. He also testified that Connell and his mother had dropped the vehicle off to have some body work done and that, at the time they found it, the vehicle was being prepared to be painted.
Mark Jones testified that Connell and Killingsworth picked him up shortly after dark on December 10, 2004, that Connell was driving his red sport utility vehicle at that time, and that they drove around and used drugs for a few hours. At some point, Connell asked him if he wanted to spend the night with him and go hunting the next morning, he said he did, and they went to his house to get a shotgun. When he came out of his house, Killingsworth was in the driver’s seat, and Connell was in the passenger seat. He gave the shotgun to Connell and got into the back seat.
Jones testified that they drove around for a while and saw a truck. Connell told Killingsworth to flash the lights, which Killingsworth did, and then the vehicle pulled into a church parking lot. Connell spoke to the men in the vehicle. The men started driving away, and they followed the vehicle a few miles.
Jones testified that, approximately thirty to forty-five minutes later, they saw the Spearses, and Connell told Killingsworth to speed up and catch the vehicle. He also testified that Connell loaded the shotgun with a shell that was in the vehicle’s console. When Killingsworth pulled beside the vehicle, Connell rolled down the window, hung out of the passenger side, and shot into the vehicle. Jones testified that Killingsworth then said, “ ‘[Y]ou did it, man.” (R. 870.)
Jones testified that they passed the vehicle, but turned around and went back to it. He also testified that Killingsworth pulled behind the vehicle and that Monica asked for help. Jones further testified that Killingsworth said, “ ‘[Y]ou take care of the woman. I will get the wallet.” (R. 872.) Connell then got a chain out of the console, went to the vehicle, and started hitting Monica with the chain. At the same time, Killingsworth opened the door, pulled Steven out of the vehicle, and took Steven’s wallet from his pocket. Jones testified that, when they got back into Connell’s vehicle, Killingsworth and Con-nell were congratulating each other, and Killingsworth said, “ ‘[Y]ou done it, man.” (R. 876.)
Jones testified that, before these events happened, he did not know what was about to happen. He also testified that, afterward, Killingsworth said they were going to Birmingham to get more drugs. Jones testified that Killingsworth got the money out of Steven’s wallet and that Connell threw the wallet out of the window several miles from the scene. He further testified that they used the money to buy cocaine and that Connell and his mother later told him they would get rid of the shotgun.
Jones admitted that he had previously made a statement in which he said that Killingsworth had borrowed Connell’s vehicle and returned and told Connell he had killed someone in it. However, he testified that he made the statement over the telephone from Connell’s mother’s house, that Connell and his mother were present when he made the statement and had told him to tell the story he told, and that he was afraid of Connell’s mother because she had *729 said she would do anything to save her son.
Corporal Johnny Tubbs of the Alabama Bureau of Investigation (“ABI”) testified that, during his investigation, Connell made a statement in which he alleged that Killingsworth had borrowed his vehicle and had returned and said that he had killed someone. Shortly thereafter, he spoke to Jones on the telephone, and Jones made a similar statement. Subsequently, he spoke to Jones in person, and Jones made a statement that was substantially similar to his trial testimony.
Tubbs also testified that he interviewed Killingsworth at the Calera Police Department at 12:44 a.m. on December 25, 2004, and that Killingsworth made a statement about his involvement in the incident at that time. A video recording of the interview was played for the jury, and we have reviewed that recording. In his statement to Tubbs, Killingsworth said that he was not the shooter and did not like being called the shooter; that it was not supposed to happen; that he was driving, Connell was in the passenger seat, and Jones was in the back seat; that he came up on a vehicle, and Connell told him to pass it; that, all of a sudden, he heard a shot and saw the vehicle veer off of the road to the right; that they turned around, went back to the vehicle, and stopped; that Connell got out, that he opened the driver’s door, and the the man was falling out of the vehicle; that Connell had a chain in his hand and must have hit the woman; that they got back into the vehicle and drove off; that Jones came up with about $600, and he assumed Jones had taken it from the victims; and that they bought drugs with the money. When he was asked if Connell had said anything before this happened, Killingsworth stated that it was kind of blurry and admitted that he had been using drugs earlier that day. He also stated that he did not know if Jones had said anything before it happened and that it was not done to commit a robbery. Finally, he stated that he had not been in the vehicle and was not involved when the coaches were pulled over earlier that evening.
Finally, the State presented evidence that Connell’s palm print was on the passenger side of the Spearses’ vehicle and that officers found bullet fragments in the door and the door sill of the vehicle. Also, Steven’s wallet was later found in a yard in Bibb County.
I.
Killingsworth’s first argument is that the trial court erred in denying his motion for a change of venue.
“ ‘A trial court is in a better position than an appellate court to determine what effect, if any, pretrial publicity might have in a particular case. The trial court has the best opportunity to evaluate the effects of any pretrial publicity on the community as a whole and on the individual members of the jury venire. The trial court’s ruling on a motion for a change of venue will be reversed only when there is a showing that the trial court has abused its discretion. Nelson v. State, 440 So.2d 1130 (Ala.Cr.App.1983).’
“Joiner v. State, 651 So.2d 1155, 1156 (Ala.Cr.App.1994).”
Clemons v. State, 720 So.2d 961, 977 (Ala.Crim.App.1996), aff'd, 720 So.2d 985 (Ala.1998). “The mere fact that publicity and media attention were widespread is not sufficient to warrant a change of venue. Rather, Ex parte Grayson[, 479 So.2d 76 (Ala.1985),] held that the appellant must show that he suffered actual prejudice or that the community was saturated with prejudicial publicity.” Slagle v. State, 606 So.2d 193, 195 (Ala.Crim.App.1992).
*730 “ ‘Moreover, the passage of time cannot be ignored as a factor in bringing objectivity to trial.’ ” Whisenhant v. State, 555 So.2d 219, 224 (Ala.Crim.App.1988), aff'd, 555 So.2d 285 (Ala.1989) (quoting Dannelly v. State, 47 Ala.App. 363, 364, 254 So.2d 434, 435 (Ala.Crim.App.1971)).
“In connection with pretrial publicity, there are two situations which mandate a change of venue: 1) when the accused has demonstrated ‘actual prejudice’ against him on the part of the jurors; 2) when there is ‘presumed prejudice’ resulting from community saturation with such prejudicial pretrial publicity that no impartial jury can be selected. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Rideau [v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) ]; Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert, denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); Coleman v. Zant, 708 F.2d 541 (11th Cir.1983).”
Hunt v. State, 642 So.2d 999, 1042-43 (Ala.Crim.App.1993), aff'd, 642 So.2d 1060 (Ala.1994).
A.
We must first determine whether the pretrial publicity resulted in “presumptive prejudice.” For prejudice to be presumed under this standard, the defendant must show: 1) that the pretrial publicity was prejudicial and inflammatory and 2) that the prejudicial pretrial publicity saturated the community where the trial was held. See Coleman v. Kemp, 778 F.2d 1487 (11th Cir.1985). Under this standard, a defendant carries an extremely heavy burden of proof.
“Hunt relies on the ‘presumed prejudice’ standard announced in Rideau, and applied by the United States Supreme Court in Estes and Sheppard[ v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966)]. This standard was defined by the Eleventh Federal Circuit Court of Appeals in Coleman v. Kemp, 778 F.2d 1487 (11th Cir.1985), cert. denied, 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986). The court stated: ‘Prejudice is presumed from pretrial publicity when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials were held.’ 778 F.2d at 1490 (emphasis added [in Hunt]). See also Holladay v. State, 549 So.2d 122, 125 (Ala.Cr.App.1988), affirmed, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).
“In determining whether the ‘presumed prejudice’ standard exists the trial court should look at ‘the totality of the surrounding facts.’ Patton v. Yount, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984); Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The presumptive prejudice standard is ‘rarely’ applicable, and is reserved for only ‘extreme situations’. Coleman v. Kemp, 778 F.2d at 1537. ‘In fact, our research has uncovered only a very few ... cases in which relief was granted on the basis of presumed prejudice.’ Coleman v. Kemp, 778 F.2d at 1490.
“Hunt had the burden of showing that ‘prejudicial pretrial publicity5 saturated the community. Sheppard, supra. ‘[T]he burden placed upon the petitioner to show that pretrial publicity deprived him of his right to a fair trial before an impartial jury is an extremely heavy one.’ Coleman v. Kemp, 778 F.2d at 1537. ‘Prejudicial’ publicity usually must consist of much more than stating the charge, and of reportage of the pre *731 trial and trial processes. ‘Publicity1 and ‘prejudice’ are not the same thing. Excess publicity does not automatically or necessarily mean that the publicity was prejudicial.
“... In order to meet the burden of showing the necessity for a change of venue due to pretrial publicity on the grounds of community saturation, ‘the appellant must show more than the fact “that a case generates even widespread publicity.” ’ Oryang v. State, 642 So.2d 979, 983 (Ala.Cr.App.1993), quoting, Thompson v. State, 581 So.2d 1216, 1283 (Ala.Cr.App.1991), cert. denied, [502] U.S. [1030], 112 S.Ct. 868, 116 L.Ed.2d 774 (1992).
“ ‘ “Newspaper articles alone would not necessitate a change in venue unless it was shown that the articles so affected the general citizenry through the insertion of such sensational, accu-sational or denunciatory statements, that a fair and impartial trial was impossible. Patton v. State, 246 Ala. 639, 21 So.2d 844 [1945].” ’
“Thompson, 581 So.2d at 1233, quoting McLaren v. State, 353 So.2d 24, 31 (Ala.Cr.App.), cert. denied, 353 So.2d 35 (Ala.1977).
“A review of the media coverage contained in the record on appeal demonstrates that the majority of print media coverage was reasonably factual and more or less objective. We find that the reportage by the news media did not result in the community being so ‘pervasively saturated’ with prejudicial publicity so as to make the court proceedings nothing more than a ‘hollow formality.’ Rideau, supra.”
Hunt, 642 So.2d at 1043-44. “To justify a presumption of prejudice under this standard, the publicity must be both extensive and sensational in nature. If the media coverage is factual as opposed to inflammatory or sensational, this undermines any claim for a presumption of prejudice.” United States v. Angiulo, 897 F.2d 1169, 1181 (1st Cir.1990).
In support of his motion for a change of venue, Killingsworth made reference to prejudicial coverage about the case. However, he did not present any specific information about that coverage or about the media materials about the cases. Based on the record before us, we cannot conclude that media materials contained prejudicial information or that media attention inflamed or saturated the community so that there was an emotional tide against him. Therefore, the record does not support a conclusion that pretrial publicity in this case was so inherently or presumptively prejudicial as to constitute one of those “extreme situations” that warrant a presumption of prejudice because of pretrial publicity.
B.
We must also determine whether the jury was actually prejudiced against Killingsworth.
“The ‘actual prejudice’ standard is defined as follows:
“ ‘To find the existence of actual prejudice, two basic prerequisites must be satisfied. First, it must be shown that one or more jurors who decided the case entertained an opinion, before hearing the evidence adduced at trial, that the defendant was guilty. Irvin v. Dowd, 366 U.S. [717,] 727, 81 S.Ct. [1639,] 1645, [6 L.Ed.2d 751, 758-59 (1961)]. Second, these jurors, it must be determined, could not have laid aside these preformed opinions and “render[ed] a verdict based on the evidence presented in court.” Irvin v. Dowd, 366 U.S. at *732 723, 81 S.Ct. at 1643 [6 L.Ed.2d at 756].’
“Coleman v. Zant, 708 F.2d at 544.”
Hunt, 642 So.2d at 1043.
“Furthermore, in order for a defendant to show prejudice, the ‘ “proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination.” Anderson v. State, 362 So.2d 1296, 1299 (Ala.Crim.App.1978).’ Ex parte Grayson, 479 So.2d 76, 80 (Ala.1985), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985).”
Oryang v. State, 642 So.2d 979, 983 (Ala.Crim.App.1993).
Killingsworth has not shown that any pretrial publicity actually prejudiced him. During the voir dire proceedings, the parties individually questioned each venire-member about, and extensively covered exposure to, the media and/or knowledge about the case. Many of the venire-members had heard, read, or seen or knew something about the case. However, very few indicated that they could not be fair based on that information, and the trial court excused those veniremembers for cause. The remaining veniremembers indicated that they could set aside any information they had previously obtained about the case and make a decision based solely on the evidence presented during the trial. Accordingly, Killingsworth has not shown that any of the jurors were actually prejudiced against him.
For these reasons, the trial court did not abuse its discretion in denying Killings-worth’s motion for a change of venue.
II.
Killingsworth’s second argument is that the trial court erred in denying three of his challenges for cause and in granting four of the State’s challenges for cause. He did not object to the trial court granting the State’s challenges for cause. Therefore, we review his argument about those challenges for plain error. See Rule 45A, Ala. R.App. P.
“On the trial for any offense which may be punished capitally or by imprisonment in the penitentiary, it is a good cause of challenge by the state that the person would refuse to impose the death penalty regardless of the evidence produced or has a fixed opinion against penitentiary punishment or thinks that a conviction should not be had on circumstantial evidence, which cause of challenge may be proved by the oath of the person or by other evidence.”
§ 12-16-152, Ala.Code 1975.
“The trial judge is given much discretion in determining whether a potential juror should be struck for cause. According to Rule 18.4(e), Ala. R.Crim. P.:
“ ‘When a prospective juror is subject to challenge for cause or it reasonably appears that the prospective juror cannot or will not render a fair and impartial verdict, the court, on its own initiative or on motion of any party, shall excuse that juror from service in the case.’
[[Image here]]
[[Image here]]
“Furthermore, in order to determine whether the trial judge’s exercise of discretion was proper, this Court will look to the questions directed to and answers given by the prospective juror on voir dire. Ex parte Cochran, 500 So.2d 1179 (Ala.1985).”
Holliday v. State, 751 So.2d 533, 535 (Ala.Crim.App.1999). Also, “ ‘[t]he trial judge is in the best position to hear a prospective juror and to observe his or her demean- or.’ ” McNair v. State, 653 So.2d 320, 324 (Ala.Crim.App.1992), aff'd, 653 So.2d 353 *733 (Ala.1994) (quoting Ex parte Dinkins, 567 So.2d 1813, 1314 (Ala.1990)). Finally,
“[t]he test for determining whether a strike rises to the level of a challenge for cause is “whether a juror can set aside their opinions and try the case fairly and impartially, according to the law and the evidence.’ Marshall v. State, 598 So.2d 14, 16 (Ala.Cr.App.1991). ‘Broad discretion is vested with the trial court in determining whether or not to sustain challenges for cause.’ Ex parte Nettles, 435 So.2d 151, 153 (Ala.1983). ‘The decision of the trial court “on such questions is entitled to great weight and will not be interfered with unless clearly erroneous, equivalent to an abuse of discretion.’” Nettles, 435 So.2d at 153. In Marshall v. State, 598 So.2d 14 (Ala.Cr.App.1991), this court held that it was not error for a trial court to deny challenges for cause of two jurors who stated that they knew the victim or her family. One veniremember had been employed as a maid by the victim’s family and the other stated that she knew the victim’s family. Marshall, 598 So.2d at 16. This court held that this relationship was not grounds for a challenge for cause as long as the juror indicates that he or she can be fair and impartial. 598 So.2d at 16.”
Dunning v. State, 659 So.2d 995, 997 (Ala.Crim.App.1994).
Killingsworth challenged Venire-members F.C., J.D., and W.J. for cause, and the trial court denied those challenges.
With regard to Veniremember F.C., the following occurred during the general voir dire examination:
“POTENTIAL JUROR: [F.C.] I was on duty the night she was brought into the hospital. I was on duty that night.
“THE COURT: Your only conflict is you were on duty when—
“POTENTIAL JUROR: When she was brought in.
“THE COURT: When Mrs. Spears was brought into the hospital?
“POTENTIAL JUROR: Yes, sir.
“[DEFENSE COUNSEL]: Did you speak with anyone there or her?
“POTENTIAL JUROR: No. I didn’t speak with her.
“[DEFENSE COUNSEL]: With her or anyone? Did you ask about what happened?
“POTENTIAL JUROR: Oh, yes, I found out, yes. That’s my job as security officer, you know. I find out what all happened to her.
“THE COURT: Based on that conversation did you form an opinion about the facts of this case that would prohibit you from being fair and impartial?
“POTENTIAL JUROR: No, sir, it didn’t.
“THE COURT: You did not?
“POTENTIAL JUROR: I did not, no, sir.”
(R. 176.) Later, during the individual voir dire examination, the following occurred:
“THE COURT: [F.C.], I have a few questions I want to ask you. First of all, regarding pre-trial publicity, have you heard anything about this case, read anything about it? Do you have any prior knowledge of the facts of this case?
“POTENTIAL JUROR: Well, yes, sir. As I told you, you know, I’m a security officer up at BMC in Alabaster. And when this incident happened, I happened to be coming through the ER whenever Mrs. Monica was brought in, you know. And I was told, you know, the situation, what had happened.
“THE COURT: Now as a security guard, you didn’t have any direct contact with Mrs. Spears?
“POTENTIAL JUROR: I did not.
*734 “THE COURT: Or any of the other people involved in this, did you?
“POTENTIAL JUROR: No, sir. I talked with Officer Wade. I don’t know if he remembers or not, you know. I’m not even really sure if we talked anything about what had happened.
“THE COURT: Other than Officer Wade, have you had any conversation whatsoever with anyone involved in this ease, be it witnesses, or law enforcement personnel?
“POTENTIAL JUROR: I have not, no, sir.
“THE COURT: Have you read or, heard anything else about this case outside of what you just described to me in your conversations with law enforcement?
“POTENTIAL JUROR: No, sir, I have not.
“THE COURT: [F.C.], my question to you then is this. Are you able to take whatever it is that you have heard and whatever knowledge that you have regarding the facts of this case or that you may have gotten that afternoon or evening at the ER and set that aside and if selected as a juror in this case, listen to the facts as they come to you from the witness stand, apply the law as the Court instructs you on the appropriate law and render a verdict that is fair both to the State and to the Defendant?
“POTENTIAL JUROR: I can, sir.
“[DEFENSE COUNSEL]: [F.C.], you were up there at the hospital when they brought in Mrs. Spears; is that correct?
“POTENTIAL JUROR: Well, I happen to be wandering through the hospital, and I did question, you know, because any time law enforcement out of our, you know, agency is in there, you know, I did question, you know, what, why Officer Wade was up there, you know.
“[DEFENSE COUNSEL]: Did you see Mrs. Spears when she was brought in?
“POTENTIAL JUROR: Not when she was first brought in.
“[DEFENSE COUNSEL]: You saw her—
“POTENTIAL JUROR: I just saw her later on.
“[DEFENSE COUNSEL]: Did you ever speak to Mrs. Spears?
“POTENTIAL JUROR: I did not, no, sir.
“[DEFENSE COUNSEL]: Or to any of her family members?
“POTENTIAL JUROR: I did not. As a matter of fact she is the only one that I saw.
“[DEFENSE COUNSEL]: But you did ask Investigator Wade what had happened?
“POTENTIAL JUROR: I did, yes.
“[DEFENSE COUNSEL]: He told you something, but you don’t remember?
“POTENTIAL JUROR: Right. I don’t remember, you know, but the information that I got about what happened was from my charge nurse, you know. Like I say, you know, she told me what had happened in the incident.
“[DEFENSE COUNSEL]: So the charge nurse gave you some description of what had happened also?
“POTENTIAL JUROR: Right.
“[DEFENSE COUNSEL]: You talked about it with her on that evening that it happened?
“POTENTIAL JUROR: Right.
“[DEFENSE COUNSEL]: And you were on duty for the remainder of that evening?
*735 “POTENTIAL JUROR: I was.
“[DEFENSE COUNSEL]: Saw these law enforcement people coming and going?
“POTENTIAL JUROR: Well, Officer Wade is the only one.
“[DEFENSE COUNSEL]: And you don’t recall as I understand it exactly what he told you?
“POTENTIAL JUROR: I don’t. I am trying to think. I don’t even remember if we talked about it or not, you know. Like I said, this has been, you know, December. I remember the night though the 10th of December of ‘04.
“[DEFENSE COUNSEL]: So you remember when it happened?
“POTENTIAL JUROR: (Nods head affirmatively).”
(R. 343^7.)
Based on his responses, the trial court could have reasonably concluded that Veniremember F.C. could set aside what he had heard about the case and render a fair and impartial verdict. Therefore, it did not exceed its discretion in denying Killingsworth’s challenge for cause as to Veniremember F.C.
With regard to Veniremember J.D., the following occurred during individual voir dire examination:
“THE COURT: Do you think that you then can take what you have read in the Centreville Press and what you have heard through the grapevine or conversation with your neighbors and set that aside and if selected as a juror in this case, listen to the facts as the facts come to you from the witness stand and apply the law and render a verdict that is fair to the State and fair for the Defendant?
“POTENTIAL JUROR: No, sir.
“THE COURT: [J.D.], would that be because you are somehow related to the family or have a personal interest in the family or tell me?
“POTENTIAL JUROR: Anybody that has lived in Bibb County and Cen-treville knows Brown Bolding. I know Brown, all of them, you know. But no, I wrestled with this last night, you know, listening to y’all talk and ask questions. And I thought to myself, I just can’t— I’ve never been a juror before, so this is my first time. I want to do it right.
“THE COURT: Well, let’s go back to some of that, and let’s clarify a couple of things ... because I want to make sure before we move on. You’re telling me that you have a close association or relationship with Mr. Brown Bolding?
“POTENTIAL JUROR: No, sir. I just know of him, you know. I don’t know him personally.
“THE COURT: You just — do you know any of the family personally?
“POTENTIAL JUROR: No, sir, I do not.
“THE COURT: But because of the fact that you know of them, you think that it would be impossible for you to render a verdict in this case?
“POTENTIAL JUROR: It would be hard.
“THE COURT: Well, of course, it’s always hard to be a juror.
“POTENTIAL JUROR: That’s true.
“THE COURT: And especially, you know, in circumstances where you are called upon to make decisions involving people that you have knowledge of.
“POTENTIAL JUROR: Yes, sir.
“THE COURT: But what you will be asked to do, [J.D.], as a juror is to set aside any knowledge that you have of the family and listen to the evidence in the case?
“POTENTIAL JUROR: Yes, sir.
*736 “THE COURT: Then I will instruct you on the appropriate law at the conclusion of the first phase of the trial.
“POTENTIAL JUROR: Yes, sir.
“THE COURT: And you will be asked to deliberate with eleven other people and talk about the case. And then you will be asked to render a verdict based on that evidence and based on those instructions. And what I’m asking you is if you think that you can render a verdict based on the evidence and be fair to both the State and the Defendant?
“POTENTIAL JUROR: I just am not sure.
“THE COURT: All right, sir. Let me ask you then a couple of questions regarding — let me back up. Do you feel as though the pre-trial publicity would in some way hamper your ability to be fair and impartial, the fact that you have knowledge of this case that came to you by way of conversation and the Centre-ville Press? That fact alone do you think it would impair your ability to render a fair and impartial verdict?
“POTENTIAL JUROR: I think so because, you know, I hear a lot of stuff, and I just don’t know.
“THE COURT: Do you feel as though you have some preconceived notion at this time as to the guilt or innocence of the Defendant?
“POTENTIAL JUROR: Yes, sir.
“THE COURT: All right. When did you make that decision about the guilt or innocence of the Defendant?
“POTENTIAL JUROR: Well, like I said I tossed and turned last night thinking about it. And it just — it’s tough.
“THE COURT: Let me ask you this. With regard to your views about the death penalty, are you so opposed to the death penalty in a capital case that it would restrict or substantially impair the performance of your duties as a juror?
“POTENTIAL JUROR: That’s my trouble. I do believe in the death penalty-
“THE COURT: Are you so opposed to anything less than death in a capital case that it would restrict or substantially impair the performance of your duties as a juror?
“POTENTIAL JUROR: No, sir.
“THE COURT: So aside from the fact that you have got this preconceived notion, under some circumstances if you are called upon to be a juror in a case, your view of the death penalty would not impair your ability to be able to give fair and equal consideration to both of those penalties, to the death penalty and life without parole if you were called upon to do that?
“POTENTIAL JUROR: No, sir, it would not.
“[PROSECUTOR]: Good morning. You believe in our justice system, right?
“POTENTIAL JUROR: Yes, sir.
“[PROSECUTOR]: Do you believe in the fact that it’s our burden as the State to prove that Mr. Killingsworth is guilty?
“POTENTIAL JUROR: Yes, sir.
“[PROSECUTOR]: And as of right now under our system he is innocent until we prove that he’s guilty?
“POTENTIAL JUROR: Yes, sir.
“[PROSECUTOR]: And if we don’t bring in any evidence to show that Mr. Killingsworth is guilty, you would vote that he’s not guilty?
“POTENTIAL JUROR: Yes, sir. If there is no evidence, there is no evidence.
*737 “[PROSECUTOR]: Right. So you’re going to follow the law and base your decision on the evidence we show you and the law as the Judge gives it?
“POTENTIAL JUROR: Yes, sir.
“[PROSECUTOR]: And as far as the death penalty as the Judge said earlier, you could vote either for the death penalty or life without parole, just depending on the circumstances of the case?
“POTENTIAL JUROR: Yes, sir.
“[SECOND PROSECUTOR]: No jurors come down here voluntarily. They are made to come.
“POTENTIAL JUROR: I know.
“[SECOND PROSECUTOR]: The simple question is this. If you take an oath to the almighty God to decide this case on the law and the evidence you hear in this courtroom, can you do that?
“POTENTIAL JUROR: Yes, sir, that’s my word.
“[SECOND PROSECUTOR]: That’s all.
“[DEFENSE COUNSEL]: Good morning, [J.D.] I appreciate your honesty. I know you are wrestling with this. The problem is you are telling us two different things.
“POTENTIAL JUROR: I’m sorry.
“[DEFENSE COUNSEL]: It ain’t your fault.
“POTENTIAL JUROR: I’m a little nervous. I’ve never done this before.
“[DEFENSE COUNSEL]: Here’s what I am hearing you telling me. You tell me if I’m wrong. I’m hearing you tell that because of your knowledge of the Bolding family and because of what you have heard about this case, that you have an opinion about what has happened?
“POTENTIAL JUROR: Yes, sir.
“[DEFENSE COUNSEL]: Now everybody is going to say if you ask 1,000 people if they can be fair, 1,000 of them will say—
“POTENTIAL JUROR: I want to try to be fair. That’s the only way I know how to be.
“[DEFENSE COUNSEL]: But you said that you had a preconceived notion, correct, about the guilt in this case?
“POTENTIAL JUROR: Well, you know, you read all of that stuff. You hear all that stuff by word of mouth. And, you know, you really don’t know what. I haven’t seen any. You know, I haven’t been in court or people show me evidence or anything.
“[DEFENSE COUNSEL]: Here’s the question. This boy is sitting right here. This is a death penalty case. This ain’t a check stealing case.
“POTENTIAL JUROR: Yes, sir, I know that. I understand that.
“[DEFENSE COUNSEL]: He has a right to have jurors on the jury who don’t have any bias either, who look at this as if they were complete strangers who knew nothing about anything and just listen to the evidence only and base their decision on the evidence only and the law as the Judge gives it to you without thinking about these good folks here, without thinking about what you have heard, without thinking about any of that. Now here’s my question to you. Can you do that? Can you honestly say you can do that?
“POTENTIAL JUROR: I’ll do my best. That’s the only thing I know how to do.
“THE COURT: Let me ask one more question. But the question that I want to clarify with you is this. Do you have a fixed opinion as to the guilt or innocence of this Defendant which would bias your verdict?
*738 “POTENTIAL JUROR: I don’t know. The man is, he is innocent as far as I know of.
“THE COURT: A minute ago you told me you had a preconceived notion.
“POTENTIAL JUROR: Well, I just—
“THE COURT: What I want to know is if that preconceived notion would bias your verdict? That’s either a yes or no.
“POTENTIAL JUROR: No. I believe I can give him a fair trial. I would try my best.”
(R. 382-90.)
Based on his responses, the trial court could have reasonably concluded that Veniremember J.D. could set aside what he had heard about the case and any preconceived ideas about the case and render a fair and impartial verdict. Venire-member J.D. also specifically stated that he was nervous because this was his first time to serve as a juror and that he wanted to do it right. Although Veniremember J.D. initially stated that it would be hard to give Killingsworth a fair trial and indicated that he had some ideas about the trial, he later specifically stated that he believed Killingsworth was innocent, that the State had the burden of proving that he was guilty, that he would follow the law and return a verdict based on the evidence presented at trial, and that he believed he could give Killingsworth a fair trial. Therefore, the trial court did not exceed its discretion in denying Killingsworth’s challenge for cause as to Veniremember J.D.
Moreover, the record on appeal indicates that Veniremember J.D. did not serve on the jury. The record also supports the inference that the defense would have struck him anyway based on its pattern of striking male veniremembers. Finally, Killingsworth has not made any showing that the jury that tried him was not fair and impartial. Accordingly, error, if any, in the denial of his challenge for cause was harmless. See Evans v. State, 794 So.2d 411 (Ala.2000). Cf. Ex parte Colby, 41 So.3d 1 (Ala.2009) (refusing to apply the harmless error rule to a ease in which the trial court erred in denying multiple challenges for cause);
With regard to Veniremember W.J., during individual voir dire examination, the following occurred:
“THE COURT: Regarding your opinion as to the death penalty, let me ask you this. Are you so opposed to the death penalty in a capital case that it would restrict or substantially impair the performance of your duties as a juror?
“POTENTIAL JUROR: No.
“THE COURT: Are you so opposed to anything less than death in a capital case that it would restrict or substantially impair the performance of your duties as a juror?
“POTENTIAL JUROR: No.
“THE COURT: Do you understand that if you’re selected as a juror in this case, then if we move into the penalty phase of this case, that you are going to be called upon to make a recommendation to the Court as to the proper sentence. Are you telling me that you could listen to the evidence offered during the penalty phase, apply the law as I instruct you on the appropriate law and give fair and equal consideration to both of the possible punishments in this case, death or life imprisonment without parole?
“POTENTIAL JUROR: Yes.
“[PROSECUTOR]: We have no questions.
“[DEFENSE COUNSEL]: [W.J.], this would ordinarily be none of our *739 business. But obviously it becomes our business now. I would like to ask you if you would to tell us how you feel about the death penalty, if you have ever thought about it much.
“POTENTIAL JUROR: Actually I have never even thought about it.
“[DEFENSE COUNSEL]: Since you have been involved in this case, have you thought about what might be the type of situation where you think it would be appropriate for the death penalty?
“POTENTIAL JUROR: I’m not sure.
“[DEFENSE COUNSEL]: Let me ask you this way. If you were seated on this jury and you got to the point where you had already found Mr. Killingsworth guilty beyond a reasonable doubt of the intentional murder of Mr. Spears, do you think then that it would be the appropriate sentence that he get the death penalty?
“POTENTIAL JUROR: I don’t know how to answer that. I don’t know really.
“[DEFENSE COUNSEL]: You would want to know more about it?
“POTENTIAL JUROR: It just depends on whatever the law is, I guess, you know. It’s already designated for whatever punishment.
“[DEFENSE COUNSEL]: Well, it’s a complicated deal. It’s hard to explain it in a short period of time. But what I want to ask you is you don’t think that even if you had found him guilty beyond a reasonable doubt of an intentional murder that he should automatically get the death penalty?
“POTENTIAL JUROR: I would say yeah.
“[DEFENSE COUNSEL]: That’s what I want to know. The Judge is going to tell you that you would — the only way we are going to get to the penalty part of this trial is if you have already found him guilty of the intentional murder of Mr. Spears beyond a reasonable doubt. You’ve got to do that before we get to the penalty phase. Then the Judge is going to tell you that you have got to listen to this evidence and that evidence and fairly weigh both of them and then make a decision. Some people just believe that you automatically get the death penalty if you’re found guilty of an intentional murder. Is that how you feel?
“POTENTIAL JUROR: No, sir.
“[DEFENSE COUNSEL]: Are there other facts and circumstances that would lead you to recommend the life without parole sentence?
“POTENTIAL JUROR: None that I can think of.
“[DEFENSE COUNSEL]: That’s what I’m asking. I think I’m not explaining myself. Do you feel like — tell me if this is correct. You said awhile ago that you feel like that in the event that Mr. Killingsworth was found guilty of the intentional murder of Mr. Spears and you found that beyond a reasonable doubt, then we get to the penalty phase. Do you think you would automatically vote to impose the death penalty?
“POTENTIAL JUROR: Actually I don’t know. I can say yes or no, but, you know, I really am not sure.
“[DEFENSE COUNSEL]: I am not asking you so much about this case. And I’m asking in general if you feel like that is in general the appropriate punishment?
“POTENTIAL JUROR: Oh, yeah.
“[PROSECUTOR]: You said earlier that you could follow the law as the Judge gave it, correct?
“POTENTIAL JUROR: Uh-huh.
*740 “[PROSECUTOR]: And that you’re not really sure how the law works as far as sentencing?
“POTENTIAL JUROR: Right.
“[PROSECUTOR]: The law is not automatic. You’re going to get the choice of death or life without parole if he is convicted. Can you see any circumstances where you would vote one way or the other? It’s not going to be automatic if the Judge doesn’t tell you it’s automatic.
“POTENTIAL JUROR: No.
“[PROSECUTOR]: So you would listen to both sides, and you would make your decision based on what both sides argue and then what the Judge told you the law was?
“POTENTIAL JUROR: Yes.
“[PROSECUTOR]: And you could follow his instructions on that?
“POTENTIAL JUROR: Yeah.
“[PROSECUTOR]: Nothing further.
“[DEFENSE COUNSEL]: But you would think going in that the death penalty ought to be what you do?
“POTENTIAL JUROR: Not really.
“THE COURT: [W.J.], let me clarify something because the word automatic was used. And there is nothing automatic about anything that we are doing here. And what I’m trying to do is to determine as best I can just exactly where you are, and I think I know. But I want to go back to where we were when you first sat down and ask you again to clarify something. What I want to know is if you’re to serve on this jury, you have got at least one job, and you potentially will have two jobs. And, the first phase of this trial will be for you to determine the guilt or innocence of the Defendant. If in fact you find the Defendant guilty of capital murder, then you together with the other eleven jurors will enter into a second phase of the trial. And that’s called the penalty phase. And it’s at that time that you are given more information, and you are given more law to consider. And then you are requested to deliberate again and then to make a recommendation. Now nothing is automatic from phase one to phase two. What you’re going to be asked to do in phase two in the sentencing phase is to consider the death penalty and life without the possibility of parole. And neither of those is automatic. You have got to be able to fairly and equally look at both of those sentences, weigh them, discuss them with the other eleven jurors and then vote your conscience and make a recommendation to this Court about the sentence. It can be the death penalty. It can be life without parole. And my question is do you think that you can give fair and equal consideration to both of those penalties?
“POTENTIAL JUROR: Yes.
“[DEFENSE COUNSEL]: We will challenge him. We don’t expect the Court to grant the challenge. But we have said what we need to say.
“THE COURT: The Court will deny the challenge.”
(R. 477-83.)
Based on his responses, the trial court could have reasonably concluded that Veniremember W.J. did not have a fixed opinion in favor of the death penalty, that he could follow the trial court’s instructions, and that he could consider both the death penalty and imprisonment for life without the possibility of parole before making a recommendation as to sentence. Therefore, it did not exceed its discretion in denying Killingsworth’s challenge for cause as to Veniremember W.J.
*741 The State challenged Veniremembers D.B., M.C., C.D., and L.K. for cause because they were opposed to the death penalty, and the trial court granted those challenges.
With regard to Veniremember D.B., the following occurred during individual voir dire examination:
“THE COURT: The next question. Are you so opposed to the death penalty in a capital case that it would restrict or substantially impair the performance of your duties as a juror?
“POTENTIAL JUROR: Yes, I think so.
“THE COURT: So you’re telling me that you think that you are so opposed to the possible sentence of death in this case that you couldn’t perform your duties as a juror?
“POTENTIAL JUROR: Yes. I’m opposed to the death penalty.
“THE COURT: You understand, [D.B.], that what you would be doing in this case if you were selected and in the event there was a conviction, you would move into a second phase of the trial where you as a juror would listen to more evidence and receive more instruction regarding the penalty phase of the trial and that you would simply make a recommendation to the Court regarding the possible sentence. Do you understand that?
“POTENTIAL JUROR: Yes, sir.
“THE COURT: Do you think then that you could give fair and equal consideration to both the death penalty and life imprisonment without parole?
“POTENTIAL JUROR: I don’t know, just the possibility of it, you know. It could come up. I don’t know.
“THE COURT: [Prosecutor]?
“[PROSECUTOR]: Yesterday before we left, you said that you didn’t want to serve on the jury; is that correct?
“POTENTIAL JUROR: Yes, sir.
“[PROSECUTOR]: Is that because of your problems with the death penalty, knowing this is a death penalty case?
“POTENTIAL JUROR: Yes, sir.
“[PROSECUTOR]: I understand that. Just one question. You see Mr. Killingsworth, the Defendant, in the room. If it came down to it, could you vote to give Mr. Killingsworth the death penalty?
“POTENTIAL JUROR: I don’t think I could.
“[PROSECUTOR]: We don’t have any more questions.
“[DEFENSE COUNSEL]: How are you, [D.B.]?
“POTENTIAL JUROR: Pretty good.
“[DEFENSE COUNSEL]: You understand that even if this case goes to the penalty phase and you’re called upon to listen to the evidence and to make a judgment about whether your sentence would be life imprisonment without parole or death penalty, you understand that would be an individual choice that you could make?
“POTENTIAL JUROR: Yes, sir.
“THE COURT: You understand that the law never requires you to vote for the death penalty but always makes it an individual moral judgment based upon the evidence that you hear. Do you understand that?
“POTENTIAL JUROR: Yes, sir.
“[DEFENSE COUNSEL]: In order to participate in this process, [D.B.], you have to be able to fairly consider both options. I understand you have feelings against the death penalty. But the question is would you be able to fairly consider both the death penalty if the *742 evidence warranted it and life without parole if the evidence warranted it and then make your own individual judgment? Could you do that in accordance with the Judge’s instructions?
“POTENTIAL JUROR: I could make an individual determination.
“[PROSECUTOR]: I have one followup. You said you could make an individual determination on your own. But looking at Mr. Killingsworth, if you look at him, could that individual determination, you personally, could you vote to give him the death penalty?
“POTENTIAL JUROR: I don’t think I could give him the death penalty, but I could vote, you know, for life in prison.
“[PROSECUTOR]: But not the death penalty? If you were given those two choices, you would vote for life without?
“POTENTIAL JUROR: Right.
“[PROSECUTOR]: We have no further questions.
“[DEFENSE COUNSEL]: You understand you don’t ever have to do that? You understand that you get to make your own decision. The question once again is can you listen to the evidence, listen to the Court’s instructions, give both sides a fair hearing and then make your own determination? Can you do that?
“POTENTIAL JUROR: I’m saying my own determination — the only sentence I could do would be life in prison without parole. I couldn’t do the death penalty.”
(R. 335-39.)
Based on his responses, the trial court could have reasonably concluded that Yeniremember D.B. had a fixed opinion against the death penalty. Therefore, it did not exceed its discretion in granting the State’s challenge for cause as to Veniremember D.B., and we do not find that there was any plain error in this regard.
With regard to Veniremember M.C., the following occurred during individual voir dire examination:
“THE COURT: ... Are you so opposed to the death penalty in a capital case that it would restrict or substantially impair the performance of your duties as a juror?
“POTENTIAL JUROR: Yes, it would.
“THE COURT: So what you’re telling me is, [M.C.], that if you are selected as a juror in this case, and if there were a conviction and we moved into the penalty phase as I explained to you out in open court, that you would be unable to listen to the facts in the penalty phase and apply the law and give fair and equal consideration to both the death penalty and life imprisonment without parole, that you would not be able to fairly consider each of those sentences and make a recommendation to the Court?
“POTENTIAL JUROR: No, I wouldn’t.
“[PROSECUTOR]: No questions.
“[DEFENSE COUNSEL]: [M.C.], if I can, let me just kind of explain a little bit more about how this works. In the event that Mr. Killingsworth was found guilty of capital murder, there would be a second trial. In that trial there would be evidence about certain circumstances that would argue in favor of the death penalty and certain circumstances that would argue in favor of the sentence of life in prison without parole. If you were on the jury, the Judge would order that you listen to those arguments and that you listen to the law as he gave it to you. And then you would be able to make an individual judgment about what *743 sentence you would recommend, be it the death penalty or life imprisonment, okay? Do you follow me on that?
“POTENTIAL JUROR: Yes.
“[DEFENSE COUNSEL]: The question for you today is would you be able to if you were seated on the jury, would you be able to fairly consider both of those sentences and yet make your own individual determination when it came time to vote?
“POTENTIAL JUROR: Well, I don’t believe in the death penalty. So, you know, I couldn’t vote on that.”
(R. 351-52.)
Based on her responses, the trial court could have reasonably concluded that Veniremember M.C. had a fixed opinion against the death penalty. Therefore, it did not exceed its discretion in granting the State’s challenge for . cause as to Veniremember M.C., and we do not find that there was any plain error in this regard.
With regard to Veniremember C.D., the following occurred during individual voir dire examination:
“THE COURT: With regard to your views about the death penalty, I will ask you this, [C.D.] Are you so opposed to the death penalty in a capital case that it would restrict or substantially impair the performance of your duties as a juror?
“POTENTIAL JUROR: I’m afraid it would.
“THE COURT: What you’re telling me then is if you’re selected as a juror in this case and we moved into the penalty phase, assuming there were a conviction, then you would be unable to give fair and equal consideration to both the death penalty and life imprisonment without parole as a possible recommended sentence?
“POTENTIAL JUROR: I would.
“THE COURT: [Prosecutor]?
“[PROSECUTOR]: Good morning. You’re against the death penalty, correct?
“POTENTIAL JUROR: Yes, sir.
“[PROSECUTOR]: And if it came down to it, if you found Mr. Killings-worth guilty of capital murder in this case, you would have two choices. You could either vote for the death penalty or for life without parole. And Mr. Kill-ingsworth, of course, is on the other side of the table. Could you vote to impose the death penalty against Mr. Killings-worth if given that choice between the two?
“POTENTIAL JUROR: I’m afraid not.
“[PROSECUTOR]: We have nothing further.
“[DEFENSE COUNSEL]: [C.D.], briefly let me ask you this. Here’s what the law is. The law as the Judge has told you is that you have to fairly consider both options if it got to it. You have to consider the death penalty fairly based on the evidence and the law, and you have to consider life imprisonment without parole. Now the law is never that a juror has to vote for the death penalty. You never have to vote for it. You make an individual moral judgment based upon the evidence and the law. In order to participate in the process, you have to be able to honestly say that you could fairly consider both options as a juror. My question to you is do you think you could fairly consider both options and then make your own judgment?
“POTENTIAL JUROR: No, sir.”
(R. 370-72.)
Based on his responses, the trial court could have reasonably concluded that *744 Veniremember C.D. had a fixed opinion against the death penalty. Therefore, it did not exceed its discretion in granting the State’s challenge for cause as to Veniremember C.D., and we do not find that there was any plain error in this regard.
With regard to Veniremember L.K., the following occurred during individual voir dire examination:
“THE COURT: With regard to the question of the death penalty and your position regarding that, I will ask you this. Are you so opposed to the death penalty in a capital case that it would restrict or substantially impair the performance of your duties as a juror?
“POTENTIAL JUROR: I don’t think so. I mean like the death penalty, I’m not for that because, well, you kill another person. Do you understand what I’m saying?
“THE COURT: Right. I understand what you’re saying. But let me — it’s a little consistent with what I was — let me rephrase my question. If you are called upon to serve on the jury in this case and there is a conviction of capital murder, then you are going to be called upon to consider the recommendation of the jury to the Court so far as the penalty is concerned. Do you follow me?
“POTENTIAL JUROR: Right.
“THE COURT: And what the penalties are are death and life without the possibility of parole, and you’ve got to be able to consider both of those fairly and equally and then make a recommendation. Are you telling me that you are so opposed to the death penalty that you would be unable to do that?
“POTENTIAL JUROR: I think I would.
“THE COURT: Is there any circumstance in which you think the death penalty is appropriate?
“POTENTIAL JUROR: I don’t think so.
“THE COURT: So in any case where a life is taken in the sense of an intentional killing, your belief is that the death penalty is not appropriate under any circumstances?
“POTENTIAL JUROR: Yes.
“THE COURT: [Prosecutor], do you have any questions?
“[PROSECUTOR]: Not right now. I have got one question, one question about your questionnaire. Has any member of your family ever been charged with or convicted of a crime?
“POTENTIAL JUROR: I’ve got a grandson.
“[PROSECUTOR]: A grandson?
You don’t have to share unless you want to, but would you like to share what it was?
“POTENTIAL JUROR: Well, one lives here, stuff they got in trouble like in school talking back, and the other boy — he is my oldest grandson. He is like fighting. I think — he was living with his grandmother, and he was in a car, and he hit somebody. And I don’t know the extent. I don’t know the details because he lived there, and I live here. But they are both in Pensacola. One boy is like — he’s in a real jail, but the other boy is in like a boy’s school. They don’t have a fence or nothing like that around the place. But they both are there. You know, they can’t come home or whatever.
“[PROSECUTOR]: Let me clarify your position on the death penalty. You just don’t think we should impose the death penalty regardless? You’re just against it?
*745 “POTENTIAL JUROR: Yeah.
“[PROSECUTOR]: That’s fine. I mean if that’s your opinion, that’s fine. We are just making sure.
“[DEFENSE COUNSEL]: The purpose of asking these questions about the death penalty is to see if you are legally qualified to serve on this jury. And in order to be legally qualified to serve on this jury and to participate in this, you have to be able to consider fairly both the death penalty and life in prison without parole if you found Mr. Killings-worth guilty of an intentional murder, okay?
“POTENTIAL JUROR: Right.
“[DEFENSE COUNSEL]: Nobody I hope would enjoy or wish to recommend the death penalty for anybody. I hope they wouldn’t. The question is could you do it if that was what the facts said and that’s what the Judge told you how to apply the facts? Could you consider it?
“POTENTIAL JUROR: I don’t think so.”
(R. 484-87.)
Based on his responses, the trial court could have reasonably concluded that Veniremember L.K. had a fixed opinion against the death penalty. Therefore, it did not exceed its discretion in granting the State’s challenge for cause as to Veniremember L.K., and we do not find that there was any plain error in this regard.
III.
Killingsworth’s third argument is that the trial court erred in dismissing twenty-six veniremembers without excuses.[1] However, as he concedes in his brief to the court, he did not first present this argument to the trial court. Therefore, we review it for plain error. See Rule 45A, Ala. R.App. P.
During a pre-trial conference, the trial court explained that it would handle requests from veniremembers who wished to be excused from service or deferred as follows:
“And what I have decided to do with regard to deferrals is to have the jurors who have excuses or want to be deferred, et cetera, et cetera to call the clerk’s office here. We will get their names, their excuse and their telephone numbers. We will accumulate a week’s worth of calls. And on Friday of each week that list will be faxed over to the AG’s office and to us, [defense counsel] and to me. And then the next week we will all have to have a conference to go over those excuses. And then I will have the clerk’s office report back to those people a result. We will maintain a record who calls, what their excuse was and what our instruction is to them. And that will be made a part of the court file. I will have an opportunity to put that on the record on the day that we begin jury selection.”
(R. 94-95.) The defense did not object to the trial court’s proposed procedure for handling requests for excuses or deferrals.
During a subsequent pre-trial hearing, the trial court stated that it would go off of the record and review requests for excuses or deferrals informally with the prosecution and the defense and that it would formally put the excuses on the record afterward. Thereafter, the trial court stated on the record the names of the veniremembers who had been deferred or *746 excused and asked if there were any objections. Defense counsel asked that felony convictions be confirmed for those venire-members who had been excused because they alleged that they had felony convictions, and the State agreed to confirm that those veniremembers had actually been convicted of felony offenses and provide supporting documentation to the trial court. Defense counsel did not otherwise object to the excuses or deferrals or to the trial court’s method of handling requests for excuses or deferrals.
The supplemental record includes the lists of veniremembers and their reasons for asking for excuses or deferrals. With regard to the veniremembers Killings-worth alleges were dismissed without excuses, the record shows the following:
Veniremember # 3 M.A. — a notation in the supplemental record indicates that he lives in Florida
Veniremember # 5 B.S.A. — a notation in the supplemental record indicates that she is a convicted felon
Veniremember #8 W.E.A. — a notation on his jury summons indicates that he is in jail
Veniremember # 28 C.M.B. — a notation in the supplemental record indicates that he is a convicted felon
Veniremember # 38 K.H.C. — a notation in the supplemental record indicates that she lives in Perry County rather than Bibb County
Veniremember #46 J.A.C. — a notation in the supplemental record indicates that her husband is disabled and she is the only person in the household who is working
Veniremember # 73 W.C.D. — a notation in the supplemental record indicates that he is in the military
Veniremember # 76 G.A.D. — a notation in the supplemental record indicates that he is eighty-four years old and cannot hear well
Veniremember # 115 L.C.G. — a notation in the supplemental record indicates that he is a convicted felon
Veniremember # 129 E.D.H. — a notation in the supplemental record indicates that she lives in Perry County rather than Bibb County
Veniremember # 131 P.J.H. — a notation in the supplemental record indicates that she no longer lives in Bibb County
Veniremember # 144 S.A.J. — a notation in the supplemental record indicates that she is disabled from a gunshot wound to the head
Veniremember # 155 D.R.J. — a notation in the supplemental record indicates that he is the primary caretaker for his wife, who had a stroke
Veniremember # 157 E.M.J. — a notation in the supplemental record indicates that she no longer lives in Bibb County
Veniremember # 169 L.C.L. — he asked to be excused because he was scheduled to start fire fighter school, neither party objected, and the trial court stated on the record that it was excusing him for that reason (R. 130)
Veniremember # 198 J.M.M. — a notation in the supplemental record indicates that he lives in Perry County rather than Bibb County
Veniremember #204 H.E.M. — a notation in the supplemental record indicates that he has felony convictions
Veniremember # 209 F.S.M. — a notation in the supplemental record indicates that she no longer lives in Bibb County
Veniremember # 262 R.G.R. — a notation in the supplemental record indicates that he is a convicted felon
Veniremember #269 M.D.S. — a notation in the supplemental record indicates that he will be out of town
*747 Veniremember # 287 J.F.S. — a notation in the supplemental record indicates that he cannot read or write
Veniremember #290 R.Y.S. — notations on her jury summons and questionnaire indicate that she lives in Tennessee
Veniremember # 800 B.E.T. — a notation in the supplemental record indicates that he lives in Perry County
Veniremember # 816 J.E.W. — notations on his jury summons and in the supplemental record indicate that he is in prison
Veniremember # 332 F.D.W. — a notation in the supplemental record indicates that his daughter called and said that he is eighty years old and in a wheelchair
Veniremember # 333 G.R.W. — a notation in the supplemental record indicates that he no longer lives in Bibb County
With regard to grounds for excusal of veniremembers, § 12-16-63, Ala.Code 1975, provides, in part:
“(a) The court, upon the request of a prospective juror pursuant to this section, shall determine on the basis of information provided during an interview with the prospective juror or other competent evidence whether the prospective juror should be excused from jury service.
“(b) A person who is not disqualified for jury service may be excused from jury service by the court only upon a showing of undue or extreme physical or financial hardship, a mental or physical condition that incapacitates the person, or public necessity, for a period of up to 24 months, at the conclusion of which the person may be directed to reappear for jury service in accordance with the court’s direction.”
Also, in McNair v. State, 653 So.2d 320, 325 (Ala.Crim.App.1992), aff'd, 653 So.2d 353 (Ala.1994), we held:
“A trial judge has ‘broad discretion’ in excusing venire members based on sickness or personal reasons, Nolen v. State, 35 Ala.App. 249, 253, 45 So.2d 786, 790, cert. denied, 253 Ala. 565, 45 So.2d 792 (1950), but that decision must not be ‘capricious or arbitrary.’ Blackmon v. State, 246 Ala. 675, 679, 22 So.2d 29, 31 (1945). ‘It is generally held, however, that the court, in the exercise of sound discretion, may excuse a juror before he is sworn for any reason personal to such person which would make his service as a juror oppressive, or in fact for any reason which to the judge seems sufficient.’ 47 Am.Jur.2d Jury § 121 (1969) (footnotes omitted). ‘There is nothing in the insistence that it is not within the legal power of the court to excuse a juror for a cause regarded as sufficient by the court.’ Evans v. State, 209 Ala. 563, 565, 96 So. 923, 924 (1923). ‘[O]f necessity, great discretionary power in the selection of jurors to try cases must rest with the trial judge, and appellate courts will not interfere with this discretion, so long as no abuse of power is shown.’ Baxley v. State, 18 Ala.App. 277, 279, 90 So. 434, 435, cert. denied, 206 Ala. 698, 90 So. 925 (1921).”
In this case, the record includes the reasons the veniremembers gave for asking to be excused from jury service. The trial court fashioned a method for handling those requests and ensured that both the prosecution and the defense had input regarding whether the veniremembers should be excused. The trial court exercised its broad discretion to excuse certain veniremembers before the trial started, and the defense did not object to the trial court’s method of handling the excuses or the excuses themselves. Finally, most of the challenged veniremembers were excused because they had prior felony convictions, were in jail or prison, no longer *748 lived in Bibb County, or were so physically disabled that they could not serve as jurors. Under these circumstances, we do not find that there was any plain error in this regard.
In a one-sentence argument, Killingsworth also asserts: “Alternatively, Appellant Killingsworth submits that the actions of the trial court below violated his rights to a fair cross-section of potential jurors in his case as guaranteed by the Sixth Amendment to the United States constitution as well as effectively tainting the venire.” (Killingsworth’s brief at p. 40.) However, he did not first present this argument to the trial court. Therefore, we review it for plain error. See Rule 45A, Ala. R.App. P.
Killingsworth has the burden of establishing a prima facie case of a fair cross-section -violation. See Rayburn v. State, 495 So.2d 733 (Ala.Crim.App.1986).
“Tn order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a “distinctive” group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.’
“Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979).”
Pierce v. State, 576 So.2d 236, 241 (Ala.Crim.App.1990).
In this case, Killingsworth makes only a fleeting reference to a violation of his right to a fair cross-section. However, he does not identify a distinctive group in the community that has been excluded or underrepresented, and he does not allege or show that any particular group has been systematically excluded from the jury veni-re list in Bibb County. Therefore, we do not find that there was any plain error in this regard.
IV.
Killingsworth’s fourth argument is that the trial court erred in denying his Batson motion. Specifically, he contends that the State used all but three of its sixteen peremptory challenges against white female veniremembers. After the jury was struck, but before it was sworn, the following occurred:
“[PROSECUTOR]: The State would like to file a reverse Batson and a JEB motion against the defense. This group panel of 43 was represented by 24 females and 19 males. The defense used all 14 of their strikes to strike white men, and as of this moment the jury is comprised of twelve females and zero males. Men, white men or men in general have the same equal protection right to serve on a jury as does a female. And by using every single strike to strike every male from this jury or at least every male other than the ones, only the four that were struck by the State, the defense has deprived the men of this panel the right to serve on this jury.
“THE COURT: [Defense counsel]?
“[DEFENSE COUNSEL]: We are prepared in the event the Court would find a prima facie case to state a gender neutral reason. Also we would make the same motion. We would make a Batson motion and a reverse Batson motion in that the State has struck in a racially discriminatory manner. They have also used all but three of their strikes to strike white females. I believe that is accurate. There is no difference in the striking pattern. I’m *749 sure they are prepared to cite race neutral and gender neutral reasons as well as the Defendant.
“[PROSECUTOR]: Well, then we would like to hear them.
“THE COURT: Is there anything else?
“[DEFENSE COUNSEL]: No, sir.
“THE COURT: I would deny the motions on both sides.”
(R. 509-10.)
“In Batson the United States Supreme Court held that black veniremembers could not be struck from a black defendant’s jury because of their race. In Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), the court extended its decision in Batson to apply also to white defendants.... The United States Supreme Court in Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), held that the protections of Batson were also available to defense counsel in criminal trials. The Alabama Supreme Court has held that the protections of Batson apply to the striking of white prospective jurors. White Consolidated Industries, Inc. v. American Liberty Insurance Co., 617 So.2d 657 (Ala.1993).”
Grimsley v. State, 678 So.2d 1194, 1195 (Ala.Crim.App.1995).
“After the appellant makes a timely Bat-son motion and establishes a prima facie showing of discrimination, the burden shifts to the state to provide a race-neutral reason for each strike.... See, e.g., Ex parte Bird, 594 So.2d 676 (Ala.1991). We will reverse the circuit court’s ruling on the Batson motion only if it is ‘clearly erroneous.’ Jackson v. State, 549 So.2d 616 (Ala.Cr.App.1989).”
Cooper v. State, 611 So.2d 460, 463 (Ala.Crim.App.1992).
“Once the prosecutor has articulated a nondiscriminatory reason for challenging the black jurors, the other side can offer evidence showing that the reasons or explanations are merely a sham or pretext. [People v.] Wheeler, 22 Cal.3d [258] at 282, 583 P.2d [748] at 763-64, 148 Cal.Rptr. [890] at 906 [(1978)]. Other than reasons that are obviously contrived, the following are illustrative of the types of evidence that can be used to show sham or pretext:
“1. The reasons given are not related to the facts of the case.
“2. There was a lack of questioning to the challenged juror, or a lack of meaningful questions.
“3. Disparate treatment — persons with the same or similar characteristics as the challenged juror were not struck....
“4. Disparate examination of members of the venire; e.g., a question designed to provoke a certain response that is likely to disqualify the juror was asked to black jurors, but not to white jurors....
“5. The prosecutor, having 6 peremptory challenges, used 2 to remove the only 2 blacks remaining on the venire....
“6. ‘[A]n explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically.’ Slappy [v. State], 503 So.2d [350] at 355 [(Fla.Dist.Ct.App.1987)]. For instance, an assumption that teachers as a class are too liberal, without any specific questions having been directed to the panel or the individual juror showing the potentially liberal nature of the challenged juror.”
Ex parte Branch, 526 So.2d 609, 624 (Ala.1987). Finally,
*750 “Alabama courts have recently held that even a showing that [a] party had ... a high percentage of strikes used against a minority was not alone enough. In Ex parte Trawick, 698 So.2d 162, 168 (Ala.1997), the Alabama Supreme Court held, ‘Without more, we do not find that the number of strikes this prosecutor used to remove women from the venire is sufficient to establish a prima facie case of gender discrimination.’ ”
Armstrong v. State, 710 So.2d 531, 533 (Ala.Crim.App.1997).
Initially, we note that, at trial and in his brief to this court, Killingsworth relies solely on the number of white female veniremembers the prosecution struck. Also, the defense used fourteen of its fifteen strikes to remove men from the veni-re. The State removed four of the five remaining men, and one man served as an alternate. Finally, we have thoroughly reviewed the record of the jury selection proceedings and the Batson arguments. In light of the argument presented by the prosecution, including the pattern of strikes of male veniremembers by the defense, we do not find that there is any inference of discrimination against white females by the prosecution. See Newton v. State, 78 So.3d 458 (Ala.Crim.App.2009). Therefore, the trial court’s decision to deny Killingsworth’s Batson motion without requiring the prosecution to give its reasons for exercising its peremptory challenges was not clearly erroneous.
V.
Killingsworth’s fifth argument is that the trial court erred in denying his motion to suppress a statement he made to law enforcement officers after he invoked his right to counsel. Specifically, he contends that he “clearly stated that he did not want to make any statement without counsel” and that the State did not establish how he allegedly reinitiated contact with Tubbs. (Killingsworth’s brief at p. 52.)
During the suppression hearing, Chief Deputy Kenneth Weems of the Bibb County Sheriffs Department testified that he came into contact with Killingsworth at the Calera Police Department on December 24, 2004, and December 25, 2004. He stated that there was a discussion among the officers about the fact that Killings-worth had indicated, possibly through another officer, to Agent Johnny Tubbs of the Alabama Bureau of Investigation (“ABI”) that he wanted to speak with him and make a statement. However, Tubbs stated that he could not talk to Killings-worth without a written request because Killingsworth had previously indicated that he did not want to talk to him. Weems testified that he communicated that information to Killingsworth, that Killingsworth wrote a note in which he indicated that he wanted to speak to Tubbs, and that he took the note to Tubbs. In the note, Kill-ingsworth wrote: “12-25-04, 12:07 a.m. I Jimmy Killingsworth understand my rights. I want to speak with the ABI agent in charge,” and he signed the note.
Weems testified that Killingsworth signed the note, that no one threatened or coerced him to write the note, that he was cooperative, that he did not appear to be under the influence of drugs or alcohol, and that he did not appear to be nervous, upset, or emotional. He also testified that he did not tell Killingsworth what to write in the note.
Corporal Johnny Tubbs of the Alabama Bureau of Investigation testified that he first came into contact with Killingsworth at 8:20 p.m. on December 24, 2004, at the Calera Police Department. At that time, he introduced himself, and Killingsworth stated that he did not want to talk without an attorney present. He obtained general *751 personal information and terminated the interview after approximately two minutes.
Tubbs testified that, later that evening, Weems told him that Killingsworth wanted to talk to him. He explained to Weems that Killingsworth had previously stated that he wanted an attorney and that he could not talk to Killingsworth unless he put the request in writing. A few minutes later, Weems gave him a note in which Killingsworth asked to talk to him.
Tubbs testified that he spoke to Killings-worth from 12:44 a.m. until 1:35 a.m. on December 25, 2004, after he finished interviewing another person. He advised Kill-ingsworth of his Miranda[2] rights, and Kill-ingsworth indicated that he wanted to waive those rights, including the right to an attorney. Tubbs also testified as follows regarding his interview with Killings-worth:
“During this time he stated I could ask him questions. He didn’t want to give a statement, but I could ask him questions indicating that he didn’t want to write it down or he just didn’t want to come out and say what happened. He wanted me to ask him questions about it.”
(R. 61.)
Brent Ellison of the Calera Police Department testified that he was involved in the arrest of Killingsworth on December 24, 2004. Sometime after they arrived at the police department, Killingsworth asked him if he could talk to some of the ABI people, and he communicated that request to some other officers. Ellison was not sure what time it was when Killingsworth made that request, but indicated initially that he thought it was before the 8:20 p.m. interview. However, he subsequently stated that Killingsworth could have made the request closer to midnight and that he could not disagree with the date and time on the note Killingsworth wrote. He also stated that he thought it took a few minutes for Tubbs to talk to Killingsworth because Tubbs was already talking to someone else.
We have reviewed the recording of the interview with Killingsworth. At the beginning of the interview, Tubbs reiterates that Killingsworth had previously told him that he did not want to talk without an attorney. He then hands Killingsworth a piece of paper, asks him if it is his handwriting, and asks him to read it out loud. Killingsworth then reads the note asking to speak to the ABI agent in charge and confirms that he signed it and dated it at 12:07 a.m. on December 25, 2004. He also stated that he gave it to a Bibb County deputy, but that he did not know the deputy’s name. After he advised Killingsworth of his Miranda rights, Tubbs asked if he wanted to talk to him, and Killingsworth responded that he did. After he obtained Killingsworth’s personal information, Tubbs again asked if he wanted to talk to him, and Killingsworth responded that he did. Shortly thereafter, Tubbs stated, “You know, you requested to talk to us,” and Killingsworth responded that he did. Finally, toward the end of the interview, Tubbs once again reminded Killingsworth that he asked to talk to him, and Killings-worth agreed with that statement.
“In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court established that, under the Fifth Amendment, one has a right to counsel during custodial interrogation. Once the right to counsel has been invoked, police officers may not ask the accused any further questions regarding an alleged crime until the accused has been given an opportunity to confer with counsel or unless the accused himself *752 initiates further contact with the police. Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1884-85, 68 L.Ed.2d 378 (1981).”
Robinson v. State, 574 So.2d 910, 914 (Ala.Crim.App.1990).
Also, recently, in Ex parte Williams, 31 So.3d 670, 671 (Ala.2009), the Alabama Supreme Court granted certiorari review, in part, to address “whether the police violated Edwards v. Arizona, 451 U.S. 477 (1981), when they reinitiated contact with Williams after he had requested counsel.” In Ex parte Williams, after an initial interrogation, members of Williams’s family had contacted a detective and told him that Williams wanted to talk to him again. The Alabama Supreme Court held that law enforcement officers did not violate Edwards when they reinitiated contact with Williams, reasoning as follows:
“Although Judge Cole’s dissent raises valid points, we agree with the majority in Van Hook [v. Anderson, 488 F.3d 411 (6th Cir.2007),] that under Edwards an accused can initiate further interrogation through a third party. We recognize that Edwards and the Supreme Court decisions both pre- and post-Ad-wards established a bright-line rule preventing police from reinitiating contact with an accused; however, those cases also recognized that an accused can later decide to reinitiate communication. Edwards was not concerned with the channels or means of communication, but with whether the accused himself reiniti-ated interrogation. With third-party communications, the police are still prohibited from reinitiating questioning, and the impetus for reinitiating must still come from the accused.”
31 So.3d at 683.
In this case, the State presented testimony from law enforcement officers that Killingsworth communicated to an unnamed officer his desire to speak with Tubbs after he had stated that he did not want to talk without an attorney. Although Ellison testified that Killingsworth made such a statement to him, he was not sure what time Killingsworth made that statement. After Weems spoke to Tubbs and Killingsworth about the request, Kill-ingsworth wrote a note indicating that he wanted to speak to the ABI agent in charge. Before he spoke to Tubbs about the offense, he read that note aloud and confirmed that he wrote and signed it. Finally, throughout the interview with Kill-ingsworth, Tubbs repeatedly stated that Killingsworth had asked to talk to him, and Killingsworth repeatedly confirmed that he had done so. Based on this evidence, the trial court could have reasonably concluded that Killingsworth reinitiat-ed communication with Tubbs, even though the parties could not determine who Killingsworth initially spoke to about reinitiating communication with Tubbs.
Killingsworth also argues that a comment he made during the interview showed that he did not want to make a statement to Tubbs. While Tubbs was covering preliminary matters, Killings-worth stated:
“Is there any way you can just ask questions and I don’t have to give a statement? I really don’t want to give a statement. But you can ask questions. If that’s possible? I don’t know if that’s possible.”
Viewed in context, however, it is clear that Killingsworth wanted to talk to the officers, but he did not want to make a specific statement about the offense. Rather, he made it clear that he would prefer for the officers to ask questions and allow him to respond to their questions. Thus, we do not find that the above statement by Kill-ingsworth indicated that he did not volun *753 tarily speak to the officers about the offense.
For these reasons, we conclude that the trial court properly denied Killingsworth’s motion to suppress the statement he made to Tubbs about the offense.
VI.
Killingsworth’s sixth argument is that the trial court erred in refusing to give his requested jury instructions regarding particularized intent, mere presence, knowledge alone being insufficient, culpability, contemplation of robbery, willingness to assist, accomplice to an intentional killing, personal intent to kill, and reckless murder.
“ ‘A trial court has broad discretion in formulating its jury instructions, providing they are an accurate reflection of the law and facts of the case. Coon v. State, 494 So.2d 184 (Ala.Cr.App.1986). When requested charges are either fairly and substantially covered by the trial judge’s oral charge or are confusing, misleading, ungrammatical, not predicated on a consideration of the evidence, argumentative, abstract, or a misstatement of the law, the trial judge may properly refuse to give such charges. Ex parte Wilhite, 485 So.2d 787 (Ala.1986).’
“Ward v. State, 610 So.2d 1190, 1194 (Ala.Cr.App.1992).”
Hemphill v. State, 669 So.2d 1020, 1021 (Ala.Crim.App.1995) (emphasis omitted).
The trial court held an informal charge conference off of the record and afterward held a formal charge conference on the record. With respect to the requested jury instructions, the trial court stated, “All other proposed instructions the Court finds that they are given in substantially the same or different form in my standard oral charge.” (R. 1011.) With the exception of the requested instruction on reckless murder, Killingsworth made a very general objection, but did not state specific grounds in support of his objection.
“No party may assign as error the court’s ... failing to give a written instruction ... unless the party objects thereto before the jury retires to consider its verdict, stating the matter to which he or she objects and the grounds of the objection.”
Rule 21.3, Ala. R.Crim. P. (emphasis added). Therefore, with the exception of the requested instruction on reckless murder, we question whether Killingsworth preserved this argument for our review. See Greenhill v. State, 746 So.2d 1064 (Ala.Crim.App.1999); Bullock v. State, 697 So.2d 66 (Ala.Crim.App.1997).
Nevertheless, we have thoroughly reviewed the trial court’s oral charge and the requested jury instructions. Although the trial court did not use the specific language Killingsworth requested, with the exception of the requested instruction on reckless murder, it did fairly and substantially cover the concepts included in the requested instructions. Therefore, we do not find that there was any error, plain or preserved, in this regard.
With regard to Killingsworth’s request for an instruction on reckless murder, we note that a person commits the offense of reckless murder if, “[u]nder circumstances manifesting extreme indifference to human life, he or she recklessly engages in conduct which creates a grave risk of death to a person other than himself or herself, and thereby causes the death of another person.” § 13A-6-2(a)(2), Ala.Code 1975. An instruction on reckless murder is not appropriate where the acts resulting in death are directed toward one or more particular people, as was the case here, rather than toward human life in general. See Parker v. *754 State, 587 So.2d 1072 (Ala.Crim.App.1991); McLaughlin v. State, 586 So.2d 267 (Ala.Crim.App.1991); Walker v. State, 523 So.2d 528 (Ala.Crim.App.1988); Ex parte McCormack, 431 So.2d 1340 (Ala.1983); Northington v. State, 413 So.2d 1169 (Ala.Crim.App.1981). In Northington, we held:
“The evidence in this case, even when viewed in the light most favorable to the prosecution, reveals that the defendant’s acts and omissions were specifically directed at a particular victim and no other.
“The State presented no evidence that the defendant engaged in conduct ‘under circumstances manifesting extreme indifference to human life’ for, while the defendant’s conduct did indeed evidence an extreme indifference to the life of her child, there was nothing to show that the conduct displayed an extreme indifference to human life generally. Although the defendant’s conduct created a grave risk of death to another and thereby caused the death of that person, the acts of the defendant were aimed at the particular victim and no other. Not only did the defendant’s conduct create a grave risk of death to only her daughter and no other, but the defendant’s actions (or inactions) were directed specifically against the young infant. F. Wharton, The Law of Homicide (3rd ed.1907) at Section 129. This evidence does not support a conviction of murder as charged under Section 13A-6-2(a)(2).”
413 So.2d at 1171-72.
From the evidence presented at trial, there was not a reasonable theory that would have supported a finding that Kill-ingsworth’s and Connell’s actions displayed an extreme indifference to human life in general. They clearly directed their actions toward Steven and Monica. Therefore, the trial court properly denied Kill-ingsworth’s request for a jury instruction on reckless murder.
VII.
Killingsworth’s seventh argument is that the trial court erroneously denied his motion for a mistrial during the penalty phase after Steven’s mother stated: “During this trial it has been so difficult for me to sleep. And I want you to know that because of you I slept last night. I thank you for all of your work truly.” (R. 1214.) However, the jury recommended a sentence of imprisonment for life without the possibility of parole. Therefore, error, if any, in this regard was harmless. See Rule 45, Ala. R.App. P.; Lee v. State, 898 So.2d 790 (Ala.Crim.App.2003); Hyde v. State, 778 So.2d 199 (Ala.Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000).
VIII.
Killingsworth’s eighth argument is that the prosecutor improperly commented on his failure to testify. During his guilt phase closing argument, the prosecutor stated:
“So Mark Jones goes in his house to pick up a shotgun. While he’s in the house, Jimmy Lamar Killingsworth and Troy Connell are left alone outside. What did they do during that time? We don’t know what they said because we haven’t heard. Mr. Killingsworth doesn’t mention it in his videotaped statement. But one thing we know did happen. They changed seats. I take back what I said earlier. Troy had been driving. Now Lamar switches to the driver’s side. Troy is in the passenger seat. What’s in that passenger seat in the console? As you heard Mark Jones say earlier, shotgun shells in the console right in front of Troy Connell.”
(R. 1020-21.) Killingsworth did not object to the argument trial. Therefore, we re *755 view it for plain error. See Rule 45A, Ala. R.App. P.
“ ‘During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.’ Rutledge v. State, 523 So.2d 1087, 1100 (Ala.Cr.App.1987), rev’d on other grounds, 523 So.2d 1118 (Ala.1988) (citation omitted). Wide discretion is allowed the trial court in regulating the arguments of counsel. Racine v. State, 290 Ala. 225, 275 So.2d 655 (1973). ‘In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, ... each case must be judged on its own merits,’ Hooks v. State, 534 So.2d 329, 354 (Ala.Cr.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989) (citations omitted) (quoting Barnett v. State, 52 Ala.App. 260, 264, 291 So.2d 353, 357 (1974)), and the remarks must be evaluated in the context of the whole trial, Duren v. State, 590 So.2d 360 (Ala.Cr. App.1990), aff'd, 590 So.2d 369 (Ala.1991). ‘In order to constitute reversible error, improper argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury.’ Mitchell v. State, 480 So.2d 1254, 1257-58 (Ala.Cr.App.1985) (citations omitted). ‘To justify reversal because of an attorney’s argument to the jury, this court must conclude that substantial prejudice has resulted.’ Twilley v. State, 472 So.2d 1130, 1139 (Ala.Cr.App.1985) (citations omitted).”
Coral v. State, 628 So.2d 954, 985 (Ala.Crim.App.1992), aff'd, 628 So.2d 1004 (Ala.1993).
We do not believe the prosecutor was commenting on Killingsworth’s decision not to testify. Rather, it appears that he was explaining that one possible inference from the evidence was that Killingsworth and Connell had discussed killing someone while Jones retrieved the shotgun from his house and that that could have been why they had changed seats when Jones returned to the vehicle with the shotgun. Therefore, we find that the argument was about a reasonable inference from the evidence rather than a comment on the fact that Killingsworth did not testify. Accordingly, we do not find that there was any plain error in this regard.
Moreover,
“[i]n all criminal prosecutions, the accused shall not be compelled to give evidence against himself. Alabama Constitution, Art. I, § 6.
“ ‘On the trial of all indictments, complaints or other criminal proceedings, the person on trial shall, at his own request, but not otherwise, be a competent witness, and his failure to make such a request shall not create any presumption against him nor be the subject of comment by counsel. If the district attorney makes any comment concerning the defendant’s failure to testify, a new trial must be granted on motion filed within 30 days from entry of the judgment.’
“Ala.Code 1975, § 12-21-220; see also Ex parte Wilson, 571 So.2d 1251, 1261 (Ala.1990); Ex parte Yarber, 375 So.2d 1231, 1233 (Ala.1979); Whitt v. State, 370 So.2d 736, 738-39 (Ala.1979).
“Comments by a prosecutor on a defendant’s failure to testify are highly prejudicial and harmful, and courts must carefully guard against a violation of a defendant’s constitutional right not to testify. Whitt, supra, at 739; Ex parte Williams, 461 So.2d 852, 853 (Ala.1984); see Ex parte Purser, 607 So.2d 301 (Ala.1992). This Court has held that comments by a prosecutor that a jury may possibly take as a reference to the de *756 fendant’s failure to testify violate Art. I, § 6, of the Alabama Constitution of 1901. Ex parte Land, 678 So.2d 224 (Ala.), cert. denied, [519] U.S. [933], 117 S.Ct. 308, 136 L.Ed.2d 224 (1996); Ex parte McWilliams, 640 So.2d 1015 (Ala.1993); Ex parte Wilson, supra; Ex parte Tucker, 454 So.2d 552 (Ala.1984); Beecher v. State, 294 Ala. 674, 320 So.2d 727 (1975).... Under federal law, a comment is improper if it was ‘ “ ‘manifestly intended or was of such a character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.’ ” ’ United States v. Herring, 955 F.2d 703, 709 (11th Cir.), cert. denied, 506 U.S. 927, 113 S.Ct. 353, 121 L.Ed.2d 267 (1992) (citations omitted); Marsden v. Moore, 847 F.2d 1536, 1547 (11th Cir.), cert. denied, 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 566 (1988); United States v. Betancourt, 734 F.2d 750, 758 (11th Cir.), cert. denied, 469 U.S. 1021, 105 S.Ct. 440, 83 L.Ed.2d 365 (1984). The federal courts characterize comments as either direct or indirect, and, in either case, hold that an improper comment may not always mandate reversal.
“Consistent with this reasoning, Alabama law distinguishes direct comments from indirect comments and establishes that a direct comment on the defendant’s failure to testify mandates the reversal of the defendant’s conviction, if the trial court failed to promptly cure that comment. Whitt v. State, supra; Ex parte Yarber, supra; Ex parte Williams, supra; Ex parte Wilson, supra. On the other hand, ‘covert,’ or indirect, comments are construed against the defendant, based upon the literal construction of Ala.Code 1975, § 12-21-220, which created the ‘virtual identification doctrine.’ Ex parte Yarber, 375 So.2d at 1234. Thus, in a case in which there has been only an indirect reference to a defendant’s failure to testify, in order for the comment to constitute reversible error, there must have been a virtual identification of the defendant as the person who did not become a witness. Ex parte Yarber, 375 So.2d at 1234; Ex parte Williams, supra; Ex parte Wilson, supra; Ex parte Purser, supra. A virtual identification will not exist where the prosecutor’s comments were directed toward the fact that the State’s evidence was uncontradicted, or had not been denied. See Beecher v. State, 294 Ala. 674, 682, 320 So.2d 727, 734 (1975); Ex parte Williams, supra; Ex parte Purser, supra. Yet, in such circumstances, it becomes important to know whether the defendant alone could have provided the missing evidence.”
Ex parte Brooks, 695 So.2d 184, 188-89 (Ala.1997) (footnotes omitted).
In this case, we believe the comment was, at most, an indirect rather than a direct reference to Killingsworth’s failure to testify and that there was not a virtual identification of Killingsworth as the person who did not become a witness. Therefore, we do not find that there was any plain error in this regard.
IX.
Killingsworth’s ninth argument is that the State did not present sufficient evidence to support his convictions. Specifically, he contends that the State did not establish that he had the particularized intent to kill and did not establish that he aided and abetted Connell.
“In deciding whether there is sufficient evidence to support the verdict of the jury and the judgment of the trial court, the evidence must be reviewed in the light most favorable to the prosecution. Cumbo v. State, 368 So.2d 871 (Ala.Cr.App.1978), cert. denied, 368 So.2d 877 (Ala.1979). Conflicting evi *757 dence presents a jury question not subject to review on appeal, provided the state’s evidence establishes a prima facie case. Gunn v. State, 387 So.2d 280 (Ala.Cr.App.), cert. denied, 387 So.2d 283 (Ala.1980). The trial court’s denial of a motion for a judgment of acquittal must be reviewed by determining whether there existed legal evidence before the jury, at the time the motion was made, from which the jury by fair inference could have found the appellant guilty. Thomas v. State, 363 So.2d 1020 (Ala.Cr.App.1978). In applying this standard, the appellate court will determine only if legal evidence was presented from which the jury could have found the defendant guilty beyond a reasonable doubt. Willis v. State, 447 So.2d 199 (Ala.Cr.App.1983); Thomas v. State. When the evidence raises questions of fact for the jury and such evidence, if believed, is sufficient to sustain a conviction, the denial of a motion for a judgment of acquittal by the trial court does not constitute error. Young v. State, 283 Ala. 676, 220 So.2d 843 (1969); Willis v. State.”
Breckenridge v. State, 628 So.2d 1012, 1018 (Ala.Crim.App.1993).
“ ‘In determining the sufficiency of the evidence to sustain the conviction, this Court must accept as true the evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider the evidence in the light most favorable to the prosecution.’ Faireloth v. State, 471 So.2d 485, 489 (Ala.Cr.App.1984), affirmed, Ex parte Faireloth, [471] So.2d 493 (Ala.1985).
“ ‘ “The role of appellate courts is not to say what the facts are. Our role, ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision to the jury.” Ex parte Bank-ston, 358 So.2d 1040, 1042 (Ala.1978). An appellate court may interfere with the jury’s verdict only where it reaches “a clear conclusion that the finding and judgment are wrong.” Kelly v. State, 273 Ala. 240, 244, 139 So.2d 326 (1962).... A verdict on conflicting evidence is conclusive on appeal. Roberson v. State, 162 Ala. 30, 50 So. 345 (1909). “[W]here there is ample evidence offered by the state to support a verdict, it should not be overturned even though the evidence offered by the defendant is in sharp conflict therewith and presents a substantial defense.” Fuller v. State, 269 Ala. 312, 333, 113 So.2d 153 (1959), cert. denied, Fuller v. Alabama, 361 U.S. 936, 80 S.Ct. 380, 4 L.Ed.2d 358 (1960).’ Granger [v. State], 473 So.2d [1137,] 1139 [(Ala.Crim.App.1985)].
“... ‘Circumstantial evidence alone is enough to support a guilty verdict of the most heinous crime, provided the jury believes beyond a reasonable doubt that the accused is guilty.’ White v. State, 294 Ala. 265, 272, 314 So.2d 857, cert. denied, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975). ‘Circumstantial evidence is in nowise considered inferior evidence and is entitled to the same weight as direct evidence provided it points to the guilt of the accused.’ Cochran v. State, 500 So.2d 1161, 1177 (Ala.Cr.App.1984), affirmed in pertinent part, reversed in part on other grounds, Ex parte Cochran, 500 So.2d 1179 (Ala.1985).”
White v. State, 546 So.2d 1014, 1017 (Ala.Crim.App.1989). Also,
“ ‘[circumstantial evidence is not inferior evidence, and it will be given the same weight as direct evidence, if it, along with the other evidence, is *758 susceptible of a reasonable inference pointing unequivocally to the defendant’s guilt. Ward v. State, 557 So.2d 848 (Ala.Cr.App.1990). In reviewing a conviction based in whole or in part on circumstantial evidence, the test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude. Cumbo v. State, 868 So.2d 871 (Ala.Cr.App.1978), cert. denied, 368 So.2d 877 (Ala.1979).’
“Ward, 610 So.2d at 1191-92.”
Lockhart v. State, 715 So.2d 895, 899 (Ala.Crim.App.1997). Further,
“ ‘[ijntent, ... being a state or condition of the mind, is rarely, if ever, susceptible of direct or positive proof, and must usually be inferred from the facts testified to by witnesses and the circumstances as developed by the evidence.’ McCord v. State, 501 So.2d 520, 528-529 (Ala.Cr.App.1986), quoting Pumphrey v. State, 156 Ala. 103, 47 So. 156 (1908).”
French v. State, 687 So.2d 202, 204 (Ala.Crim.App.1995), aff'd in part, rev’d in part on other grounds, 687 So.2d 205 (Ala.1996).
“‘The question of intent is hardly ever capable of direct proof. Such questions are normally questions for the jury. McMurphy v. State, 455 So.2d 924 (Ala.Crim.App.1984); Craig v. State, 410 So.2d 449 (Ala.Crim.App.1981), cert. denied, 410 So.2d 449 (Ala.1982).’ Loper v. State, 469 So.2d 707, 710 (Ala.Cr.App.1985).”
Oryang v. State, 642 So.2d 989, 994 (Ala.Crim.App.1994).
Killingsworth was charged with committing murder through the use of a deadly weapon while the victim was in a vehicle, see § 13A-5-40(a)(17), Ala.Code 1975; through the use of a deadly weapon fired from a vehicle, see § 13A-5-40(a)(18), Ala.Code 1975; and during the course of a first-degree robbery or an attempt thereof, see § 13A-5-40(a)(2), Ala.Code 1975. At trial, the State proceeded under an accomplice liability theory. Alabama’s accomplice liability statute provides:
“A person is legally accountable for the behavior of another constituting a criminal offense if, with the intent to promote or assist the commission of the offense:
[[Image here]]
“(2) He aids or abets such other person in committing the offense.... ”
§ 13A-2-23, Ala.Code 1975.
“The words ‘aid and abet’ encompass all assistance by acts, words of encouragement, or support, or presence, actual or constructive, to render assistance should it become necessary. Wright [v. State, 494 So.2d 936 (Ala.Crim.App.1986)]; Sanders v. State, 423 So.2d 348 (Ala.Cr.App.1982). Actual participation in the crime need not be proved by positive testimony to convict someone of aiding and abetting. ‘The jury is to determine whether the appellant’s participation exists and the extent of it from the conduct of the parties and all the testimony presented.’ Walls v. State, 378 So.2d 1186, 1191 (Ala.Cr.App.1979), cert. denied, Ex parte Walls, 378 So.2d 1193 (Ala.1980). Such facts as the defendant’s presence in connection with his companionship, and his conduct at, before and after the commission of the act, are potent circumstances from which participation may be inferred.”
Henry v. State, 555 So.2d 768, 769 (Ala.Crim.App.1989).
“Any word or act contributing to the commission of a felony, intended and calculated to incite or encourage its ac *759 complishment, whether or not the one so contributing is present, brings the accused within the statute that makes any person concerned in the commission of a felony, directly or indirectly, a principal.... No particular acts are necessary to make one an aider and abettor; the common enterprise or adventure may have been entered into on the spur of the moment without prearrangement or participation.”
Scott v. State, 374 So.2d 316, 318-19 (Ala.1979). And,
“ ‘[w]here the evidence is conflicting as to the defendant’s connection as an accomplice or co-conspirator, a jury question is presented.’ Sanders v. State, [423 So.2d 348 (Ala.Crim.App.1982)], citing Watkins v. State, 357 So.2d 156, 160 (Ala.Crim.App.1977), cert. denied, 357 So.2d 161 ([Ala.] 1978).”
Henry, 555 So.2d at 770.
“ ‘[U]nder the accomplice liability doctrine, a nontriggerman accomplice may be convicted of the capital offense of double murder only if he had the particularized intent that both victims be killed. In addition, “[t]o affirm a finding of a ‘particularized intent to kill’ the jury must be properly charged on the intent to killed issue.” ’
“Tomlin v. State, 591 So.2d 550, 557 (Ala.Cr.App.1991) (citations omitted). ‘ “Intent, ... being a state or condition of the mind, is rarely, if ever, susceptible of direct or positive proof, and must usually be inferred from the facts testified to by witnesses and the circumstances as developed by the evidence.” ’ French v. State, 687 So.2d 202, 204 (Ala.Cr.App.1995), rev’d on other grounds, 687 So.2d 205 (Ala.1996) (quoting McCord v. State, 501 So.2d 520, 528-29 (Ala.Cr.App.1986)).
“ ‘ “The question of intent is hardly ever capable of direct proof. Such questions are normally questions for the jury. McMurphy v. State, 455 So.2d 924 (Ala.Crim.App.1984); Craig v. State, 410 So.2d 449 (Ala.Crim.App.1981), cert. denied, 410 So.2d 449 (Ala.1982).’ Loper v. State, 469 So.2d 707, 710 (Ala.Cr.App.1985). “Where one assaults another by the use of a deadly weapon, the law will infer from that fact that he designed to accomplish the probable and natural results of his act, in the absence of proof to the contrary.” Snipes v. State, 364 So.2d 424, 426 (Ala.Cr.App.1978).’
“Oryang v. State, 642 So.2d 989, 994 (Ala.Cr.App.1994).”
Wilson v. State, 777 So.2d 856, 932-33 (Ala.Crim.App.1999).
“Pulling the trigger is only one factor in determining intent to kill. Ritter v. State, 375 So.2d 270, 274-275 (Ala.1979). From the testimony concerning the defendant’s words and actions during the course of the robbery, the jury had sufficient evidence from which to infer that the defendant was prepared to kill, intended to kill, and supported Watkins in his killing of Mr. Mayfield and, thus, that the defendant was an accomplice to the intentional killing [the victim].”
Ex parte Raines, 429 So.2d 1111, 1113 (Ala.1982). Finally, “‘[w]hether a non-trigger man aided and abetted the actual killing itself, such as by being present to render assistance in the killing itself if it becomes necessary, will almost always be a jury question.” ’ ” Gamble v. State, 791 So.2d 409, 445 (Ala.Crim.App.2000) (quoting Rowell v. State, 570 So.2d 848, 851 (Ala.Crim.App.1990) (quoting in turn Car-nis, Alabama’s 1981 Capital Punishment Statute, 42 Ala. Law. 456, 469 (1981))).
Based on the evidence set forth in detail above, the jury could have believed that Killingsworth supported Connell’s actions, *760 that he was ready and willing to assist Connell if and when it became necessary, and that his participation in the incident was significant. Therefore, the jury could have reasonably concluded that Killings-worth was an accomplice and that he had the particularized intent that Steven be killed. Accordingly, his argument to the contrary is without merit.
X.
Killingsworth’s tenth argument is that the cumulative effect of the above alleged errors entitles him to a new trial. We have considered each of the allegations of error individually, and we have not found that any of those allegations of error require reversal. We have also considered the allegations of error cumulatively, and we do not find that “the accumulated errors have ‘probably injuriously affected [Killingsworth’s] substantial rights.’ ” Ex parte Woods, 789 So.2d 941, 942-43 n. 1 (Ala.2001) (quoting Rule 45, Ala. R.App. P.). Therefore, Killingsworth’s argument is without merit.
XI.
Finally, pursuant to § 13A-5-53, Ala.Code 1975, we are required to address the propriety of Killingsworth’s convictions and sentence of death. Killingsworth was indicted for and convicted of capital murder because he committed the murder through the use of a deadly weapon while the victim was in a vehicle, see § 13A-5-40(a)(17), Ala.Code 1975; through the use of a deadly weapon fired from a vehicle, see § 13A-5-40(a)(18), Ala.Code 1975; and during the course of a first-degree robbery or an attempt thereof, see § 13A-5-40(a)(2), Ala.Code 1975.
The record does not reflect that the sentence of death was imposed as the result of the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5 — 53(b)(1), Ala.Code 1975.
The trial court found that the aggravating circumstances outweighed the mitigating circumstances. It found that the State proved two aggravating circumstances — 1) Killingsworth committed the offense while he was under sentence of imprisonment, see § 13A-5-49(l), Ala.Code 1975, and 2) Killingsworth committed the capital offenses while he was engaged in or was an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit, robbery, see § 13A-5-49(4), Ala.Code 1975. The trial court found that there were not any statutory mitigating circumstances in this case. It also found the following to be nonstatu-tory mitigating circumstances: 1) Killings-worth’s low mental capacity; 2) Killings-worth’s poor childhood; 3) Killingsworth’s drug and alcohol use; 4) Killingsworth was a good prisoner; 5) Killingsworth was an accomplice and not the actual shooter; and 6) the jury’s recommendation of a sentence of imprisonment for life without the possibility of parole. The sentencing order shows that the trial court weighed the aggravating and mitigating circumstances and correctly sentenced Killingsworth to death. The record supports its decision, and we agree with its findings.
Section 13A-5-53(b)(2), Ala.Code 1975, requires us to weigh the aggravating and mitigating circumstances independently to determine the propriety of the sentence of death. After independently weighing the aggravating and mitigating circumstances, we find that the death sentence is appropriate.
As required by § 13A-5-53(b)(3), Ala.Code 1975, we must determine whether the sentence was disproportionate or excessive when compared to the penalty imposed in similar cases. Killingsworth committed the murder through the use of a deadly weapon while the victim was in a vehicle, through the use of a deadly weap *761 on ñred from a vehicle, and during the course of a first-degree robbery or an attempt thereof. Similar crimes are being punished by death throughout this state. See Lewis v. State, 57 So.3d 807 (Ala.Crim.App.2009); Flowers v. State, 799 So.2d 966, 995-96 (Ala.Crim.App.1999); Gaddy v. State, 698 So.2d 1100 (Ala.Crim.App.1995), aff'd, 698 So.2d 1150 (Ala.1997); Brooks v. State, 695 So.2d 176 (Ala.Crim.App.1996), aff'd, 695 So.2d 184 (Ala.1997); Bush v. State, 695 So.2d 70 (Ala.Crim.App.1995), aff'd, 695 So.2d 138 (Ala.1997); Peoples v. State, 510 So.2d 554 (Ala.Crim.App.1986), aff'd, 510 So.2d 574 (Ala.1987). Therefore, we find that the sentence was neither disproportionate nor excessive.
Finally, we have searched the entire record for any error that may have adversely affected Killingsworth’s substantial rights, and we have not found any. See Rule 45A, Ala. R.App. P.
Accordingly, we affirm Killingsworth’s convictions and sentences.
AFFIRMED.
WELCH, WINDOM, KELLUM, and MAIN, JJ., concur.

. Although Killings worth alleges that twenty-eight veniremembers were dismissed without excuses, he lists only twenty-six venire-members, and we address only those venire-members.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).